**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| PARDALIS TECHNOLOGY LICENSING, L.L.C.,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE GLOBAL, INC.,<br><br>Defendant. | CIVIL ACTION NO. 7:25-cv-457<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF PARDALIS TECHNOLOGY LICENSING, L.L.C.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. DISPUTED CLAIM TERMS ..... 1

A. Term 1: Informational Object ..... 1

B. Term 2: Data Element ..... 4

C. Terms 3-9: Authentication Server 141 Is Corresponding Structure for the Claimed "Enabling … To Create" Functions ..... 5

1. The Specifications Link Authentication Server 141 to "Enabling . . . To Create" ..... 5

2. Authentication Server 141 Is Disclosed Structure, Not an Undefined "Black Box" ..... 7

D. Terms 10-14: Authoring Server 143 Is Corresponding Structure for the Claimed "Authenticating" Functions ..... 9

1. The Specifications Link Authoring Server 143 to the Claimed "Authenticating" Functions ..... 10

2. Authoring Server 143 Is Disclosed Structure, Not an Undefined Software "Black Box." ..... 12

E. Terms 15-21: Authoring Server 143 Is Corresponding Structure for the Claimed "Converting" Functions ..... 13

F. Terms 22-23 ..... 15

1. Authentication Server 141 Is Corresponding Structure for the Claimed "Enabling to Retrieve" Functions (Terms 22A and 23) ..... 15

2. Member Accessing Server Software Module 144 Is Corresponding Structure for the Claimed Function (Term 22B) ..... 17

G. Terms 24-25: Authoring Server 143 Is Corresponding Structure for the Claimed "Assigning" Functions ..... 19

H. Terms 26-27 Do Not Impermissibly Mix Statutory Classes ..... 21

1. Term 27 .......... 21

2. Terms 26A-C .......... 22

I. Term 29: “Product” Is Not Limited to a “Physical Product” .......... 23

J. Term 30: “Immutable Draft Data Element” Is Not Indefinite .......... 27

III. CONCLUSION .......... 30

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016) ..... 4

*Blackboard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009) ..... 9

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ..... 22

*Contech Stormwater Solutions, Inc. v. Baysaver Techs., Inc.*,
310 F. App'x 404 (Fed. Cir. Feb. 13, 2009) ..... 2

*Dolby Labs., Inc. v. Intertrust Techs. Corp.*,
No. 19-cv-03371-EMC,
2021 U.S. Dist. LEXIS 20762 (N.D. Cal. Feb. 3, 2021) ..... 2

*E.I. du Pont de Nemours & Co. v. Unifrax LLC*,
921 F.3d 1060 (Fed. Cir. 2019) ..... 25

*Eceipt, LLC v. Victoria's Secret Stores, LLC*,
No. 6:20-CV-747-ADA,
2021 U.S. Dist. LEXIS 167543 (W.D. Tex. Sept. 3, 2021) ..... 23, 24

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014) ..... 24

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) ..... 2

*Fintiv, Inc. v. Paypal Holdings, Inc.*,
134 F.4th 1377 (Fed. Cir. 2025) ..... 13

*Hill-Rom Servs. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ..... 25

*H-W Tech., L.C. v. Overstock.com, Inc.*,
758 F.3d 1329 (Fed. Cir. 2014)........................................................................................ 22

*Impact Engine, Inc. v. Google LLC*,
No. 2022-2291,
2024 U.S. App. LEXIS 16254 (Fed. Cir. 2024)........................................................... 20

*In re Katz*,
639 F.3d 1303 (Fed. Cir. 2011)........................................................................................ 22

*In re Raiz*,
No. 2024-1533,
2025 U.S. App. LEXIS 3075 (Fed. Cir. 2025) ............................................................. 13

*In re Shafovaloff*,
2025 WL 1779173 (Fed. Cir. 2025)................................................................................. 30

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)........................................................................................ 22

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009)........................................................................................ 25

*Kumar v. Ovonic Battery Co.*,
351 F.3d 1364 (Fed. Cir. 2003)........................................................................................ 26

*LBS Innovations, LLC v. Apple Inc.*,
No. 2:19-cv-00119-JRG-RSP,
2020 U.S. Dist. LEXIS 69373 (E.D. Tex. April 20, 2020)........................................... 24

*Mastermine Software, Inc. v. Microsoft Corp.*,
874 F.3d 1307 (Fed. Cir. 2017)........................................................................................ 21

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*,
520 F.3d 1367 (Fed. Cir. 2008)................................................................................. 21, 22

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016)........................................................................................ 23

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ........................................ 27, 29

*Netsocket, Inc. v. Cisco Sys., Inc.*,
No. 2:22-CV-172-JRG,
2024 U.S. Dist. LEXIS 241107 (E.D. Tex. May 29, 2024) ........................................ 23

*Noah Sys. Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012) ........................................ 7

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ........................................ 2

*Pardalis Technology Licensing, L.L.C. v. International Business Machines Corporation*,
Case No. 2:22-CV-452-JRG-RSP ........................................ 1

*Pfizer Inc. v. Ranbaxy Labs.*,
457 F.3d 1284 (Fed. Cir. 2006) ........................................ 23

*Rain Comp.*, *Inc. v. Samsung Am.*, *Inc.*,
989 F.3d 1002 (Fed. Cir. 2021) ........................................ 8

*SightSound Techs. LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) ........................................ 2, 4

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
987 F.3d 1358 (Fed. Cir. 2021) ........................................ 30

*Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
988 F.2d 1165 (Fed. Cir. 1993) ........................................ 21

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........................................ 23

*TQP Dev., LLC v. Intuit Inc.*,
No. 2:12-CV-180-WCB,
2014 U.S. Dist. LEXIS 84057 (E.D. Tex. June 20, 2014) ........................................ 2

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015).......... 8

*WSOU Invs. LLC v. Google LLC*,
2023 U.S. App. LEXIS 25255 (Fed. Cir. Sept. 25, 2023).......... 29, 30

**Rules, Statutes, and Other Authorities**

35 U.S.C. § 112(6) .......... *passim*

# I. INTRODUCTION[1]

Coinbase insists that this Court re-construe dozens of terms that were already construed in 106-page order in March 2024 by Judge Payne in *Pardalis Technology Licensing, L.L.C. v. International Business Machines Corporation*, Case No. 2:22-CV-452-JRG-RSP. *See generally* Dkt. 70-10 (Order). In fact, as will be shown throughout this brief, Coinbase advances many of the same arguments that were previously advanced and rejected. And the claims were not only construed in that case, but Pardalis obtained a successful jury verdict on the ’869 patent and another related patent, the ’000 patent. *See* Ex. A (Jury Verdict). Coinbase suggests that Federal Circuit law presents new issues for this Court regarding means-plus-function claiming and alleged mixed method/system claiming, but again those arguments have already been advanced and rejected. Additionally, Coinbase asks the Court to incorrectly construe the terms “informational object” and “data element” inconsistently among the related patents, to import an embodiment of a “physical product” into the claims, and to ignore the context of the claims in order to find the term “immutable draft data element” to be indefinite. Coinbase’s proposed constructions should thus be rejected.

# II. DISPUTED CLAIM TERMS

## A. Term 1: Informational Object

Coinbase’s argument is based on the incorrect assumption that “informational object” should be construed differently for the three related patents-in-suit. That assumption lacks foundation, and thus Coinbase’s argument collapses.

[1] Although Defendant’s Exhibit D (Dkt. 70-5) lists 43 disputed terms, Coinbase neither addresses Terms 28 and 31-43 nor had leave to do so. *See* Dkt. No. 69. Those terms therefore are not before the Court. Additionally, Coinbase briefed 31 disputed terms, exceeding the Court’s 30-term limit.

The ’869 patent is a continuation-in-part of the ’696 patent and the ’668 patent is, in turn, a continuation-in-part of the ’869 patent. *See* Dkt. 33 (First Am. Complaint) at ¶¶29-31. In the previous litigation of these patents, IBM similarly argued that the discussions of “informational object” in these patents’ specifications were “inconsistent,” but Judge Payne correctly found that “no inconsistency is apparent.” *See* Order at 10-11. He further explained:

> The disclosure of the later patents can be considered when construing terms in the earlier ’696 Patent. *See Contech Stormwater Solutions, Inc. v. Baysaver Techs., Inc.*, 310 F. App’x 404,407 (Fed. Cir. Feb. 13, 2009) (“The disclosure in the [later] patent is relevant for claim construction of the earlier . . . patent claim because the [later] patent was issued to the same inventors from a continuation-in-part of the [earlier] patent.”); *see also SightSound Techs. LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) (“Where multiple patents “derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.”) (quoting *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005)).

*Id.* And on that basis Judge Payne determined that “informational object” meant, for all three patents, “a set of one or more data elements, data elements sets, informational objects, or any combination thereof.”[2] *Id.* at 12.

That construction correctly provides a consistent construction for this term across the three related patents, is consistent with the usage of the term in the claims and is consistent with the discussion of the term in the specifications. In addition to the supporting caselaw above explaining

[2] *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (“Given the importance of uniformity in the treatment of a given patent, this court would be remiss to overlook another district court’s construction of the same claim terms in the same patent.” (internal quotations omitted)); *Dolby Labs., Inc. v. Intertrust Techs. Corp.*, No. 19-cv-03371-EMC, 2021 U.S. Dist. LEXIS 20762, at *15 (N.D. Cal. Feb. 3, 2021) (“A district court’s claim constructions ‘in cases involving the same patent’ are therefore ‘entitled to substantial weight.’” (quoting *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 U.S. Dist. LEXIS 84057, at *22 (E.D. Tex. June 20, 2014)).

that claims should be construed consistently across related patents, these patents illustrate the "informational object" identically in Figure 2:[3]




*FIG. 2*

Similarly, the '869 patent explains that "[a]n Informational Object is comprised of one or more Data Elements, Data Element Sets, or Informational Objects, or any combination thereof," (Dkt. 70-3 ('869 patent), 8:66-9:1) while the '696 patent explains that "[t]set of information contained in an informational object comprises a plurality of individual data elements" (Dkt. 70-2 ('696 patent), 4:25-27). And while Coinbase contends that the patents define the term differently and that requires separate definitions, Judge Payne explained that "although the patents set forth a

[3] The '696 patent says that "FIG. 2 illustrates a typical informational object and its contents that can be authored, distributed and maintained by the present informational object authoring and distribution system," (Dkt. 70-2 ('696 patent), 3:25-29), and the '869 and '668 patents similarly say that "FIG. 2 illustrates a typical Informational Object and its contents that can be authored, distributed and maintained by the present Common Point Authoring system." (Dkt. 70-3 ('896 patent), 6:43-46; Dkt. 70-4 ('668 patent), 6:41-43).

section in which 'terms are defined,' those disclosures refer to what a data element 'comprises' (or 'is comprised of') and what an informational object 'comprises' (or 'is comprised of'), and 'comprises' in patent parlance is generally non-exclusive. '696 Patent at 4:3-4 & 4:17-26; '869 Patent at 8:10-11 & 8:59-9:5." Order at 12.

Finally, in addition to inviting the Court to incorrectly construe the term differently among the related patents, Coinbase's construction would also read out or make redundant other claim language. For example, both of Coinbase's proposed constructions would require the "information object" to be immutable and uniquely identified. As Judge Payne found, that cannot be because other claim language addresses those limitations. *See* Claim Construction Order at 11 (quoting *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant.").

**B. Term 2: Data Element**

Coinbase's arguments for "data element" fails for the same reasons as do its arguments for "informational object," and more. First, Coinbase asks the Court to construe the plain and ordinary term "data element" differently across the three related patents. As discussed, that has been rejected by the Federal Circuit. *See SightSound Techs. LLC*, 809 F.3d at 1316. Second, Coinbase contends that the patents separately defined this term, and so the Court is required to adopt the so-called definitions. Not so. As Judge Payne found, the disclosures from the patents' specification "demonstrate that 'data element' is a broad term that could potentially encompass any amount of data." Order at 15. Furthermore, the patents discuss "data element" in terms of what it could "comprise," and in patent parlance "comprise" is generally non-exclusive. *See* '696 patent, 4:17-

20; ’869 patent, 8:54-65.[4] Third, a “data element” was a commonly understood term to persons of ordinary skill at the time of inventions, as shown by multiple dictionaries from that timeframe. Microsoft’s Computer Dictionary, Fifth Edition (2002) defines a “data element” as “[a] single unit of data.” Ex. B (Microsoft Computer Dictionary) at PARDALIS_002622. Similarly, The American Heritage College Dictionary, Third Edition (1993), defines “data” as “[n]umerical or other information represented in a form suitable for processing by computer.” Ex. C (The American Heritage College Dictionary) at PARDALIS_002635.

Thus, “data element” should be given is plain and ordinary meaning, and Coinbase’s two competing constructions should be rejected.

### C. Terms 3-9: Authentication Server 141 Is Corresponding Structure for the Claimed “Enabling … To Create” Functions

The parties agree that Terms 3-9 are governed by § 112(6) and substantially agree on the claimed functions. The dispute is whether the specifications disclose corresponding structure. They do. The specifications expressly link authentication server 141 to the authoring permissions that enable an authorized member to proceed to the disclosed process for creating the claimed draft data elements and informational objects. *See* Ex. D (Novak Decl.) at ¶¶ 41-99; *see also* ’696 patent, 7:67-8:7, 9:22-42, Figs. 1B, 4, 5; ’869 patent, 4:9-18, 17:7-14, 18:28-50, Figs. 1B, 4, 5. Judge Payne considered these same disclosures and concluded that “[t]he claimed functions are thus clearly linked to the ‘authentication server 141,’” construing the corresponding structure as “authentication server 141, and equivalents thereof.” Order at 45-49. Coinbase provides no persuasive reason to reach a different result.

#### 1. The Specifications Link Authentication Server 141 to “Enabling . . . To Create”

---

[4] Unless specified otherwise, citations to the specification of the ’869 patent apply equally to the specification of the ’668 patent.

Coinbase first argues that authentication server 141 merely checks a member's identity and permissions and therefore does not perform the claimed function of "enabling" an authorized member to create the recited object. *See* Dkt. 70 (Op. Br.) at 6-8. That argument divorces the authentication step from the authoring process, which contradicts the specification. The '696 patent explains that authentication server 141 checks the member's identity against authorized member database 123 "to ensure that this member has the good standing and permissions to create an additional data element at step 512 by accessing the process illustrated in FIG. 4." '696 patent, 8:4-7. The related disclosure likewise explains that authentication server 141 determines whether the member "has the authoring Permissions to access the process illustrated in FIG. 5," after which the system advances to the step where the member initiates the authoring process by creating the draft informational object. *Id.* at 9:28-30; *see* '869 patent, 18:28-50; Dkt. 70-4 ('668 patent), 18:5-27.

Coinbase's argument effectively substitutes "creating" for the claimed function of "enabling an authorized authoring member to create." But to perform that enabling function, the authentication server 141 need not itself author the object. The claimed function requires the authentication server to *enable* the authorized member to create the object, not to create the object itself. *See* '696 patent, 7:67-8:7, 9:22-42, Figs. 4, 5; '869 patent, 17:7-14, 18:28-50, Figs. 4, 5. Authentication server 141 checks the member's identity against the authorized member database 123 and determines whether the member has the requisite authoring permissions. *Id.* If the member lacks those permissions, the system logs the member out. *Id.* If authorized, the member is permitted to proceed to the authoring processes disclosed in Figures 4 and 5 and the accompanying specification. *Id.* That is not merely generic access to a computer system. It is authorization to proceed with the specific authoring process disclosed in the patents. Coinbase's attempt to separate

the authentication server from the creation process thus disregards the linkage the specifications expressly provide.

Coinbase relies on *Noah* for the proposition that verifying a passcode was insufficient disclosure for functions involving entry, editing, and processing of data. *See* Op. Br. at 8 (citing *Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1314 (Fed. Cir. 2012)). But the disclosure here does not stop at verifying credentials as a prerequisite to generic system access. The authentication server 141 determines whether the member has the authoring permissions necessary to access an identified authoring process, and the specification then describes the system advancing through that process to creation of the claimed draft object. '696 patent, 9:32-42; '869 patent, 18:36-50.

Nor does the prosecution history establish otherwise. Coinbase relies on statements made during prosecution of the later-issued, non-asserted '765 patent. *See* Op. Br. at 7-8. There, the applicant distinguished Lucas's disclosure of a unique user identifier that permitted an employee to access an existing inventory database because that disclosure did not enable the employee to create the claimed draft object. *See* Dkt. 70-8 ('765 Patent Prosecution History) at CGI_00020229. That distinction does not establish that authorization cannot perform the claimed "enabling to create" function. The asserted patents disclose that authentication server 141 determines whether the member has the requisite authoring permissions to proceed to the authoring processes disclosed in Figures 4 and 5.'696 patent, 7:67-8:7, 9:22-42, Figs. 1B, 4, 5; '869 patent, 4:9-18, 17:7-14, 18:28-50, Figs. 1B, 4, 5. The prosecution history therefore does not support Coinbase's attempt to sever authorization from the authoring process it controls.

#### 2. Authentication Server 141 Is Disclosed Structure, Not an Undefined "Black Box"

Coinbase next characterizes authentication server 141 as a generic software "black box" because the specification identifies it among software modules executed by applications server

121. *See* Op. Br. at 8-11. But Pardalis does not identify the generic word "module" as corresponding structure. It identifies the authentication server 141 as described in the specification, including its relationship to identified databases and its specified role in the authoring process.

Coinbase's reliance on *Williamson* and *Rain* is likewise misplaced. Those cases recognize that the generic term "module," standing alone, may provide no indication of structure. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350-51 (Fed. Cir. 2015); *see also Rain Comp.*, *Inc. v. Samsung Am.*, *Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021). But a "module" is not Pardalis' proposed corresponding structure. The specifications identify authentication server 141, describe its relationship to applications server 121 and authorized member database 123, and explain its role in determining whether a member possesses the authoring permissions necessary to access the disclosed authoring process.'696 patent, 5:55-59, 7:67-8:7, 9:22-42, Figs. 1B, 4, 5; '869 patent, 4:9-18, 13:22-27, 17:7-14, 18:28-50, Figs. 1B, 4, 5. Indeed, in rejecting the same attempt to characterize the disclosed servers as generic software modules, Judge Payne found that "authoring server" and "authentication server" connote sufficiently definite structure. Order at 98–100. The disclosures of the authentication server 141 are thus materially different from the generic "module" found insufficient in *Williamson* and *Rain*.

Indeed, Judge Payne considered precisely whether authentication server 141 was insufficient computer-implemented structure. The court concluded that authentication server 141 is "a special-purpose structure that is disclosed in the specification and that is clearly linked to the claimed functions." Order at 46. The court explained that even assuming the server is ultimately implemented on a general-purpose computer, the corresponding structure is not that generic computer but "the particular authentication server 141 as described in the specification." *Id*. That

distinction matters because Coinbase's argument again strips the identified component from the disclosures that describe it.

The court also expressly addressed *Blackboard*, the underlying authority for Coinbase's "black box" characterization. *See* Op. Br. at 11. There, the claimed "access control manager" was an undefined abstraction whose manner of operation the specification failed to disclose. *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009). The court found the disclosure here materially different: authentication server 141 is the particular disclosed special-purpose structure, and the specification provides additional detail concerning its operation. Order at 46-47. Thus, Coinbase's renewed characterization of authentication server 141 as a "black box" does not identify a deficiency that was overlooked; it relabels the same argument that was already expressly considered and rejected.

The specifications' additional algorithmic disclosure further confirms that authentication server 141 is not an unexplained functional black box. For example, the specifications describe the operative sequence. *See* '696 patent, 7:67-8:7, 9:22-42, Figs. 1B, 4, 5; '869 patent, 4:9-18, 17:7-14, 18:28-50, Figs. 1B, 4, 5. The member accesses the Common Point Authoring System and executes the login process; authentication server 141 checks the member's identity against authorized member database 123; that check determines whether the member is in good standing and possesses the authoring permissions necessary to access the identified authoring process. *Id.* If the member is not authorized, the system logs the member out. *Id.* If authorized, the member proceeds to the authoring processes disclosed in Figures 4 and 5 and the accompanying specification. *Id.* Those disclosures describe how server 141 performs the claimed enabling function rather than merely restating the function itself.

### D. Terms 10-14: Authoring Server 143 Is Corresponding Structure for the Claimed "Authenticating" Functions

Coinbase does not dispute the function recited in Terms 10-12 or the meaning of "authenticating." The dispute is whether the specifications disclose corresponding structure. They do. The specifications identify authoring server 143 and describe the operations it performs on a draft data element or informational object as part of the authoring and registration process. *See* Ex. D (Novak Decl.) at ¶¶ 100-138; *see also* '696 patent, 5:55-59, 8:27-37, 8:58-63, 10:24-26, Figs. 1B, 4, 6; '869 patent, 13:22-27, 17:35-50, 17:65-18:6, 19:50-52, Figs. 1B, 4, 6. Judge Payne relied on these disclosures in construing the related authentication limitations now presented as Terms 13-14, finding authoring server 143 sufficiently linked to the authentication function and identifying "authoring server 143, and equivalents thereof" as corresponding structure. Order at 52-55. Coinbase provides no basis for a different result.[5]

### 1. The Specifications Link Authoring Server 143 to the Claimed "Authenticating" Functions

Coinbase argues that the specifications do not link authoring server 143 to authentication because they describe the authoring server as reviewing content and format, checking permissions, and preventing duplication rather than expressly stating that server 143 "authenticates" the draft object. Op. Br. at 12-13. But § 112(6) does not require the specification to repeat the precise verb used in the claim. It requires the disclosed structure to be clearly linked or associated with performance of the claimed *function*. Here, the specifications identify authoring server 143 and describe the operations it performs on the draft object as part of the process by which that object

[5] Coinbase does not raise any independent basis for indefiniteness as to Terms 13-14, relying entirely on its linkage and structure arguments for Terms 10-12. *See* Op. Br. at 16. The same analysis therefore resolves Terms 13-14. For Term 14, Defendant's Exhibit D contains a typographical error. Pardalis proposed the function "enabling an authorized individual *to authenticate* said draft data element . . .," not "enabling an authorized individual *to create* data . . . ."

is reviewed, approved, and registered in immutable form.'696 patent, 10:24-36, Fig. 6; '869 patent, 19:50-62, Fig. 6.

Coinbase improperly conflates the meaning of the claimed function with determining the corresponding structure. Coinbase argues that the disclosed operations cannot link authoring server 143 to the claimed function because content, format, permissions, and duplication checks do not themselves constitute "determining whether something is of genuine origin." But the fact that an individual operation does not, standing alone, constitute the entire claimed function does not establish that the operation cannot form part of the disclosed structure for performing that function. The relevant question is whether the specification sufficiently links authoring server 143 and the disclosed operations to the claimed authentication function. The Order confirms this distinction. The court rejected IBM's attempt to define "authenticating" by the disclosed content, format, and permissions checks, construing the term instead to mean "determining whether something is of genuine origin." Order at 23-25. The disclosed authoring process further ties the draft object to its author. After login and confirmation that the member is in good standing and otherwise permitted to proceed, the member must select the member's previously stored name from membership database 123 and insert that name into the informational object before submitting it for registration.'696 patent, 9:54-67; '869 patent, 18:64-19:11. Authoring server 143 then checks the submitted object.'696 patent, 10:24-26; '869 patent, 19:50-52. In addressing the § 112(6) limitations, the court relied on the disclosed operations performed by the authoring server 143 to find it sufficiently linked to the authentication function. Order at 52-55. Coinbase therefore cannot rely on the Court's construction of "authenticating" to disregard the disclosed operations when determining corresponding structure.

Nor does the prosecution history compel a different result. The applicant distinguished Lucas's verification of personal information supplied by a customer registering to use its system from authentication of the claimed draft informational object "which uniquely identifies the product for tracking purposes" and was "created by the authorized authoring member." Dkt. 70-8 ('765 Patent Prosecution History) at CGI_00020229. But Coinbase's conclusion that "data validation or verification 'has nothing to do with authenticating' data elements and/or informational objects" does not follow. *See* Op. Br. At 14. That distinction establishes only that Lucas's user-registration verification was not the claimed object authentication, not that the specification's disclosed operations on the claimed object cannot link authoring server 143 to the authentication function.

### 2. Authoring Server 143 Is Disclosed Structure, Not an Undefined Software "Black Box."

Coinbase again contends that a disclosed server is an insufficient software "black box" because the specification identifies it among software modules executed by applications server 121. Op. Br. at 14-15. That argument fails for the reasons discussed above. *See supra* § II.C.2. Pardalis does not rely on a generic "module" as corresponding structure, but on the particular authoring server 143 as described in the specifications. The specifications identify authentication server 141, authoring server 143, and the authoring client and describe their respective roles in the disclosed authoring and registration processes. The specifications also describe the operations server 143 performs on the draft data element and draft object, including reviewing content and format, comparing language against approved terms, reviewing image data, checking for adequate information and duplication, and checking content, format, and permissions.'696 patent, 5:55-59,8:27-37, 8:58-63, 10:24-26, Figs. 1B, 4, 6; '869 patent, 13:22-27, 17:35-50, 17:65-18:6, 19:50-52, Figs. 1B, 4, 6. Thus, the disclosure identifies not merely the result to be achieved, but the

operations performed by the identified server on the claimed draft data element and draft object. Judge Payne relied on these disclosures in finding server 143 linked to the claimed authentication function and further held that authoring server 143 is "a special-purpose structure" consisting of "the particular 'author[ing] server 143' as described in the specification." Order at 54. Coinbase's renewed "black box" characterization does not undermine those findings.

Nor do *Raiz* and *Fintiv* support Coinbase's position. In *Raiz*, the court found "contract software" insufficient where the specification lacked a step-by-step explanation of how the software performed the claimed functions, while the court in *Fintiv* involved generic functional disclosures without details of an algorithm for performing them. *See In re Raiz*, No. 2024-1533, 2025 U.S. App. LEXIS 3075 at *8-10 (Fed. Cir. 2025); *see also Fintiv, Inc. v. Paypal Holdings, Inc.*, 134 F.4th 1377, 1384-85 (Fed. Cir. 2025). Those deficiencies are not present here. Figure 6 identifies authoring server 143 as checking the submitted informational object at step 602 as part of the informational-object registration process. *See, e.g.,*'696 patent, 10:24-26; '869 patent, 19:50-52. Figure 4 separately details the review of draft data elements, including comparison against approved terms, review of image content and coding, checking for adequate information, and rejection of flawed drafts with an explanation. *See, e.g.,*'696 patent, 7:56-9:9; '869 patent, 16:59-18:16. Considered together, the flowchart and accompanying disclosures describe the process performed by the identified server, rather than merely assigning the claimed function to generic software.

### E. Terms 15-21: Authoring Server 143 Is Corresponding Structure for the Claimed "Converting" Functions

Coinbase argues that Term Nos. 15-21 are indefinite because the patents purportedly do not link the authoring server 143 to the claimed converting functions, and because the authoring server 143 is allegedly not structure. Op. Br. at 16-17. Both arguments fail.

First, the specifications clearly link authoring server 143 to the claimed converting functions. *See* Ex. D (Novak Decl.) at ¶¶ 139-179. While Coinbase claims that the specifications do not use the word "converting" when describing server 143's operations, § 112(6) does not require repetition of the precise verb used in the claim. *Id.* at 17. Further, Figure 6 and its accompanying description disclose that authoring server 143 checks the unregistered informational object, generates and substitutes a unique identifier, date- and time-stamps the object, and stores the resulting registered object in immutable form. *See* '696 patent, 10:24-36, Fig. 6; '869 patent, 19:50-66, Fig. 6. The specifications similarly disclose that authoring server 143 generates and assigns a unique registered identifier to a draft data element before the resulting data element is permanently added to the registered database. *See* '696 patent, 8:27-49, 8:58-9:9, Fig. 4; '869 patent, 17:35-56, 17:65-18:16, Fig. 4. These disclosures link authoring server 143 to the process by which the draft object becomes its corresponding immutable object. Relying on these same disclosures, Judge Payne expressly found that "[t]he specifications [] disclose that converting to 'immutable' form is performed by 'authoring server 143.'" *See* Order at 60-68.

Coinbase is also wrong in claiming that those disclosures do not support "converting" because the claims separately recite "storing." Op. Br. at 17-18. Pardalis does not equate storing with converting. Figure 6 discloses the sequence of operations performed by authoring server 143 through which the draft object becomes the corresponding immutable object, *followed by* storage of the registered object in immutable form. *See* '696 patent, 10:18-39, Fig. 6; '869 patent, 19:43-20:2, Fig. 6. The separate claimed storage limitation therefore does not undermine that linkage. Pardalis relies on the operations preceding storage as the disclosed conversion process, not on storage itself as the act of converting.

Second, Coinbase's contention that authoring server 143 is an insufficient software "black box" fails for the reasons discussed above. *See supra* § II.C.2. The same disclosures linking authoring server 143 to the converting functions also identify the particular server and the operations it performs. *See* '696 patent, 8:27-49, 8:58-9:9, 10:24-36, Fig. 4, Fig. 6; '869 patent, 13:64-14:1, 18:6-16, 19:52-62, Fig. 4, Fig. 6. And Judge Payne rejected the "black box" argument for these same converting limitations, finding authoring server 143 to be "a special-purpose structure that is discussed throughout the specifications" and construing the corresponding structure as "authoring server 143, and equivalents thereof." Order at 66-68.

### F. Terms 22-23[6]

#### 1. Authentication Server 141 Is Corresponding Structure for the Claimed "Enabling to Retrieve" Functions (Terms 22A and 23)

These terms appear in claim 2 of the '696 patent (Term 22A) and claim 2 of the '668 patent (Term 23). Coinbase contends that the terms are indefinite because the specifications allegedly fail to disclose sufficient corresponding structure. But the specifications disclose the authentication server 141 as the corresponding structure, which determines whether the member is authorized to proceed with the disclosed retrieval process. *See* Ex. D (Novak Decl.) at ¶¶ 180-186, 196-200; '696 patent, 11:41-50, Fig. 9; '668 patent, 22:21-28, Fig. 9. For example, Figure 9 illustrates the "Member Access Process," and the accompanying specification expressly describes the role of authentication server 141 in that process:

> When a Member accesses the Common Point Authoring system 10 at step 901 and executes the Member access system login process at step 902, the Member's identity is checked against an authorized Member database 123 by the authentication server 141 at step 903 to ensure that this Member is a Member in good standing and has the Permissions to access the process illustrated in FIG. 9.

[6] Defendant's Exhibit D (Dkt. 70-5) contains a typographical error as to Term 22. Pardalis proposed "authentication server 141, and equivalents thereof" as corresponding structure for claim 2 of the '696 patent and "member accessing server software module 144, and equivalents thereof" for claim 24. Pardalis therefore addresses these limitations separately below as Terms 22A and 22B.

> If not, at step 904, the Common Point Authoring system 10 logs out. If the Member is in good standing, the Common Point Authoring system 10 advances to step 905 where the Member server 144 provides the Member with access to the Informational Object database 125 using the predefined set of Permissions for both the Member and the Livestock Informational Objects. At step 906, the Member selects one of the Livestock Informational Objects for retrieval and the document version of the Informational Object at step 907. The Common Point Authoring system 10 retrieves the selected Informational Object at step 908 . . .

’668 patent, 22:21-38. This disclosure expressly links authentication server 141 to the claimed “enabling to retrieve” function. At step 903, authentication server 141 determines whether the member has the permissions necessary “to access the process illustrated in FIG. 9.” A member who fails that determination is logged out at step 904 and cannot proceed to retrieval. A member who satisfies it proceeds to steps 905 through 908, where the member obtains access to the informational object database, selects an informational object, and the system retrieves it. Thus, authentication server 141 performs the disclosed authorization determination that enables an authorized accessing member to proceed with retrieval.

Coinbase improperly focuses on which component ultimately retrieves the informational object rather than the claimed function (which Coinbase does not dispute) of “enabling an authorized accessing member to retrieve” it. Authentication server 141 need not itself retrieve the informational object to perform that *enabling* function. The claim requires enabling an authorized accessing member to retrieve the object, and Figure 9 expressly ties authentication server 141’s authorization determination to whether the member may proceed through the retrieval process. Indeed, Coinbase concedes elsewhere that authentication server 141 determines whether a member may access the system by checking the member’s identity. *See* Op. Br. at 7. That is precisely the authorization determination Figure 9 identifies as the gateway to the retrieval process.

Coinbase’s “black box” argument again fails. *See supra* § II.C.2. Coinbase contends that authentication server 141 cannot constitute corresponding structure without disclosure of an

algorithm. *See* Op. Br. at 19. But Figure 9 and its accompanying description disclose the operative sequence Coinbase claims is missing. ’696 patent, 11:41-63, Fig. 9; ’668 patent, 22:21-41, Fig. 9. Authentication server 141 checks the member’s identity against authorized member database 123 at step 903 to determine whether the member is in good standing and has permission to access the Figure 9 process. *Id*. If the member fails that check, the system logs the member out at step 904; if the member satisfies it, the process advances to steps 905 through 908, culminating in retrieval of the selected informational object. *Id*. Thus, even if an algorithm were required (it is not), the specifications disclose the sequence by which authentication server 141 performs the authorization determination that enables the member to proceed to retrieval. Accordingly, Coinbase has not shown that Terms 22A and 23 are indefinite.

### 2. Member Accessing Server Software Module 144 Is Corresponding Structure for the Claimed Function (Term 22B)

The parties agree that Term 22B (claim 24 of the ’696 patent) is subject to 35 U.S.C. § 112(6) and that the claimed function is “enabling an authorized accessing member to retrieve a selected informational object and its associated data elements.” Coinbase contends that the term is indefinite based on allegedly deficient corresponding structure. But the specification discloses that the structure for performing this function is the member accessing server software module 144, and equivalents thereof. *See* Ex. D (Novak Decl.) at ¶¶ 187-195. The ’696 patent identifies the “member accessing server 144” as one of the “software modules” executed by server 121:

> Similarly, a single server 121 is illustrated herein, executing a plurality of software modules: authentication server 141, tracking/billing server 142, authoring server 143, member accessing server 144, advertising server 145, but multiple servers can be used to perform this task.

’696 patent, 5:55-59; *see also id*. at Abstract (“The informational object authoring and distribution system provides a set of software modules that . . . customers, as members of the system . . . can use to *retrieve*, maintain and distribute the Material Safety Data Sheets.”) (emphasis added); 2:16-

21 (same). Thus, Pardalis does not rely on the generic word "module" as corresponding structure, but on the particular member accessing server 144 as described in the specification. The '696 patent expressly identifies member accessing server 144 among the software modules executed by server 121.

The specification further associates member server 144 with the claimed retrieval function. Figure 9 illustrates the "Member Access Process" and the accompanying specification explains:

> If the member is in good standing, the informational object authoring and distribution system 10 advances to step 905 where the member server 144 provides the member with access to the informational object database 125 using the predefined set of permissions for both the member and the informational objects. At step 906, the member selects one of the informational objects for retrieval and the document version of the informational object at step 907. The informational object authoring and distribution system 10 retrieves the selected informational object at step 908.

*Id.* at 11:51-60. Figure 9 thus does not merely identify member server 144 generally in connection with retrieval. It places member server 144 directly in the disclosed retrieval process and identifies the particular operation it performs in that process. At step 905, member server 144 provides the member with access to informational object database 125 using predefined permissions for both the member and the informational objects. The process then proceeds to selection of the informational object and document version at steps 906 and 907 and retrieval of the selected informational object at step 908. These disclosures sufficiently associate member accessing server 144 with the claimed function.

Nor is member accessing server 144 an unexplained software "black box." *See supra* § II.C.2. Figure 9 and the accompanying specification disclose the operative retrieval sequence: after successful login and authorization, member server 144 provides access to informational object database 125 using predefined permissions; the member selects an informational object and document version; and the system retrieves the selected informational object. *See* '696 patent,

11:51-12:17, Fig. 9. Thus, even if additional algorithmic disclosure were required (it is not), the specification discloses the relevant sequence of operations and identifies the role performed by member server 144 within that sequence.

Pardalis' proposed construction is also consistent with the prior court's preliminary construction of materially analogous claim language. Claim 18 of the '869 patent similarly recited "member client server means for enabling an authorized accessing member to retrieve a selected informational object." The court preliminarily determined that the term was governed by § 112(6), identified the same claimed function, and identified the corresponding structure as "member server 144, and equivalents thereof." Order at 85-86. Although that term was subsequently removed from dispute and did not receive a final construction, the court's preliminary construction provides additional support for identifying member server software module 144 as corresponding structure for the analogous retrieval limitation here. Accordingly, Coinbase has not shown that Term 22B is indefinite.

### G. Terms 24-25: Authoring Server 143 Is Corresponding Structure for the Claimed "Assigning" Functions

Coinbase argues that Term Nos. 24-25 are indefinite because the authoring server 143 is allegedly an insufficient software "black box" and the cited disclosures merely restate the claimed assigning functions. Op. Br. at 19. Neither argument has merit.

First, Coinbase's "black box" argument fails for the reasons discussed above. *See supra* § II.C.2. Pardalis does not rely on the generic word "module" as corresponding structure, but on the particular authoring server 143 as described in the specification of the '696 patent. The specification expressly links that server to the claimed "assigning" functions. *See* Ex. D (Novak Decl.) at ¶¶ 201-214. For Term 24, it discloses that authoring server 143 generates a unique registered data element identifier and assigns it to the draft data element.'696 patent, 8:66-9:2.

Figure 4 likewise places that operation within the disclosed data-element creation process at step 407. *See id.*, Fig. 4. For Term 25, it discloses that authoring server 143 generates a unique informational object identification and substitutes it for the filename created by the member. *Id.*, 10:26-30. Figure 6 depicts that operation at step 603 within the informational-object creation process. *See id.*, Fig 6. By generating the unique identification and substituting it for the member-created filename, authoring server 143 assigns that unique identification to the draft informational object. These disclosures identify the particular server that performs the claimed functions and the operations it performs on the respective draft objects.

Second, Coinbase contends that these disclosures merely restate the claimed function. Op. Br. at 19. That is wrong, because the specifications identify authoring server 143 as the structure performing the functions, describe the operations it performs in generating and assigning the respective unique identifiers, and depict those operations within the processes shown in Figures 4 and 6. *See* '696 patent, 8:66-9:2, 10:26-30, Figs. 4, 6. That is far more than a bare restatement of the claimed functions.

These disclosures further differ from the purely functional language at issue in *Impact Engine*. *See* Op. Br. at 19. There, the court rejected language that merely restated the claimed function without providing corresponding structure. *Impact Engine*. *See Impact Engine, Inc. v. Google LLC*, No. 2022-2291, 2024 U.S. App. LEXIS 16254, at *20-25 (Fed. Cir. 2024). Here, the patents do not merely state that an unidentified component "assigns" an identifier. They identify authoring server 143, disclose what it generates and what it assigns or substitutes, identify the draft object on which it operates, and depict those operations at the corresponding steps in Figures 4 and 6. *See* '696 patent, 8:27-9:9, 10:18-39, Figs. 4, 6. This is not merely functional language stating a result to be achieved.

### H. Terms 26-27 Do Not Impermissibly Mix Statutory Classes

Coinbase incorrectly suggests that certain dependent claims are indefinite for allegedly containing limitations covering both an apparatus and a method. They do not. *See* Ex. D (Novak Decl.) at ¶¶ 215-238. But even if the claims include functional language within an apparatus claim, or vice versa, indefiniteness turns on "the lack of clarity as to when the mixed subject matter claim would be infringed." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). Method claims may identify the structure in, by, or on which the method is performed, and apparatus claims may use functional language to describe system capabilities where it remains clear when infringement occurs. *Id*. at 1374-75; *Mastermine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017). Under this standard, the following terms and the claims in which they appear are not indefinite. And here again, Judge Payne previously rejected these same arguments.

#### 1. Term 27

Coinbase argues that the phrase "wherein [said/the] authorized authoring member creates [a data element/an informational object]" renders the challenged system claims indefinite because it requires a user to perform a method step. *See* Op. Br. at 20. It does not. The disputed language describes what occurs through operation of the functionality recited by the claimed system, not a separate act of use that creates uncertainty as to when the system is infringed. *See Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1172 (Fed. Cir. 1993). For example, claim 3 of the '869 patent recites means for "enabling an authorized authoring member to create" a draft informational object, while dependent claim 5 recites the resulting creation of that object.'869 patent, cls. 3, 5.

Coinbase's reliance on *IPXL*, *Katz*, and *H-W Technology* is therefore misplaced. Those claims required a user to actually use an input means, enter data, or complete a transaction, creating uncertainty whether infringement occurred upon making the apparatus or only upon its use. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); *In re Katz*, 639 F.3d 1303, 1318 (Fed. Cir. 2011); *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335-36 (Fed. Cir. 2014). Here, the "wherein" language describes what results from functionality already required of the claimed authoring system. It does not create a separate user action on which infringement depends. Judge Payne considered the same mixed method-apparatus challenge, rejected indefiniteness, and gave the disputed language its plain meaning. Order at 34-36.

**2. Terms 26A-C**

Coinbase's challenge to Terms 26A-C also fails. Claims 10, 15, and 16 of the '869 patent are dependent method claims, and their reference to a "common point authoring system" does not convert them into apparatus claims. Claim 10, for example, depends from method claim 9 and adds the step of "enabling an authorized accessing member to retrieve a selected informational object."'869 patent, cls. 9-10. The "common point authoring system" language appears only in the preamble and neither recites essential structure nor provides necessary antecedent basis. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc*., 289 F.3d 801, 808 (Fed. Cir. 2002).

Judge Payne reached the same conclusion. He found the "common point authoring system" language "merely descriptive" and the remainder of claim 10 an added step to the method of claim 9. Order at 31-32. The court likewise found claim 15 presented "essentially the same dispute," held its preamble nonlimiting, and rejected indefiniteness. *Id*. at 35. Even if the preambles were limiting, identifying the structure in which the claimed method is performed creates no uncertainty as to when infringement occurs. *See Microprocessor Enhancement*, 520 F.3d at 1374.

Coinbase's § 112 ¶ 4 theory fares no better. Op. Br. at 22-23. Each dependent claim further limits the method from which it depends: claim 10 adds the retrieval-enabling step; claim 15 further defines the enabling step; and claim 16 further limits the converting step. *See* '869 patent, cls. 10, 15, 16. The reference to a "common point authoring system" does not replace those inherited method limitations with apparatus subject matter. Coinbase's authorities involving dependent claims that fail to narrow, or conflict with, their parent claims therefore do not apply. Coinbase's authorities do not establish otherwise. Those cases involved dependent claims that failed to further limit, or were inconsistent with, their parent claims. *See Pfizer Inc. v. Ranbaxy Labs.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006); *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016); *Netsocket, Inc. v. Cisco Sys., Inc.*, No. 2:22-CV-172-JRG, 2024 U.S. Dist. LEXIS 241107, at *79-80 (E.D. Tex. May 29, 2024). Here, each challenged claim adds a further limitation to the method from which it depends.

**I. Term 29: "Product" Is Not Limited to a "Physical Product"**

Coinbase improperly, and expressly, seeks to narrow "product" to "physical product" based on examples and embodiments in the specification. Op. Br. at 23. However, Coinbase does not, and cannot, contend or prove that "product" lacks a plain or established meaning, or that the patentee disavowed the full scope of that meaning. Thus, the broad term "product" should be given its full scope. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) (emphasizing that "[t]he patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope"); *see also Eceipt*, *LLC v. Victoria's Secret Stores*, *LLC*, No. 6:20-CV-747-ADA, 2021 U.S. Dist. LEXIS 167543 at *8 (W.D. Tex. Sept. 3, 2021).

Limitations from a preferred embodiment should not be imported into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited. *See EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014); *see also Eceipt*, 2021 U.S. Dist. LEXIS 167543, at *4. Coinbase's reliance on the specification's exemplary discussion of livestock, animal products, harvested products, and fabricated products does not meet that standard. Those examples may provide context, but they do not establish that the patentees clearly intended to limit the broader claim term "product" to "physical product."

The claims themselves undermine Coinbase's construction. The references in the specification to a "physical or processed product" demonstrates that the patentee knew how to specify a physical product when intended. *See*, *e.g.*, '869 patent, 1:29-60. But in the claims, the patentee chose instead to use the broader term "product" without that modifier. The omission of the "physical" modifier from the claims weighs against adding that limitation through claim construction. *See LBS Innovations, LLC v. Apple Inc.*, No. 2:19-cv-00119-JRG-RSP, 2020 U.S. Dist. LEXIS 69373, at *65 (E.D. Tex. April 20, 2020) ("Had the patentee wanted to limit the claim to 'new' information, he could have easily done so.").

And while it would be improper to limit the claims to examples described in the specification, the specification clearly supports giving "product" its full meaning. The '869 patent is entitled "Common point authoring system *for tracking* and authenticating *objects* in a distribution chain." '869 patent, title page (emphasis added); *see also id.* at 11:17-25. And the Field of the Invention explains that "[t]his invention is an automated system known as the Common Point Authoring system that facilitates the immutable authoring, unique identification, authentication, *tracking*, ownership and control, advertising, sale and/or purchase of *Informational Objects*." *Id.* at 1:15-19. As discussed *supra*, the "Informational Object is comprised of one or

more Data Elements, Data Element Sets, or Informational Objects." *Id.* at 8:66-9:1. In other words, the patent is about tracking not just physical products, but information, or non-tangible products.

Indeed, in the "Problem" section on which Coinbase heavily relies, the patentee explains that "[t]he beef livestock industry is illustrative of the nature of this problem and is used as an example for the purpose of illustrating the operation of the Present Common Point Authoring system *but is not intended to limit the scope of the described system*." *Id.* at 3:59-63 (emphasis added). Coinbase nevertheless improperly seeks to import the "physical" limitation from examples of the specification into the broader claim term "product." That is plainly improper. *See Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification . . . we do not read limitations from the embodiments in the specification into the claims."); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

Furthermore, the disclosure of the '696 patent, which is the parent patent of the '869 and '668 patents, also supports giving "product" its full scope. *See E.I. du Pont de Nemours & Co. v. Unifrax LLC*, 921 F.3d 1060, 1082 (Fed. Cir. 2019) ("Of course, a parent patent is relevant to claim construction issues involving its continuation-in-part child and therefore ought to be considered for its probative value."). The '696 patent, entitled "Informational object authoring and distribution system," discloses an embodiment involving creation of informational objects and data elements in the context of chemical Material Safety Data Sheets that "can be used to identify products and services that are pertinent to the chemical identified" in those sheets. '696 patent, 3:7-18. In other words, the embodiment discussed in the '696 patent is not physical in nature, which is further supportive of giving the term "product" in the later patents its full scope.

Still further, the prosecution of the ’668 patent demonstrates that a person of ordinary skill would have understood “product” to have its plain meaning. There, the examiner initially rejected the claim in view U.S. Patent No. 7,069,234 (“Cornelius”), which is generally about tracking transactions within an e-commerce system. *See* Ex. E (’668 Patent Office Action) at 7-8; *see also* Ex. F (Cornelius) at 33:11-18, 34:1-5. Further, Cornelius provides the following explanation of products:

> Products can be further divided into physical and electronic.
>
> Physical—Any tangible product the buyer can touch or feel (for example, cars, refrigerators, food, or furniture). This would include retail and durable goods.
>
> Electronic—Any product delivered over an electronic medium. This may include content, information, audio and video, or software (for example, music, or financial products such as insurance or mutual funds).

Ex. F (Cornelius) at 175:13-21. This patent is part of the intrinsic record and further demonstrates that a person of ordinary skill would not have understood the inventions of the ’869 and ’668 patents to be limited to tracking physical products. *See Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

Extrinsic evidence further supports Pardalis’s position. Pardalis’s press release announcing the issuing of the ’696 patent explained that “[t]he invention would significantly increase the ability to *trace the movement of digital information*.” *See* Ex. G (Pardalis Press Release) at PARDALIS_002686 (emphasis added). And in a white paper entitled “Banking on Granular Information Ownership,” Pardalis explained the applicability of the patents, and in particular the ’869 patent, to “informational products,” stating that “the immutable Informational Objects may be applied to the granular authentication, tracking and control of information products by the individual information producers,” including as related to “transactional tracking.” *See* Ex. H (Pardalis White Paper) at PARDALIS_002709-10 & 002712-13.

Thus, in this case, unlike the cases that Coinbase relies upon, there is substantial intrinsic and extrinsic evidence supporting giving "product" its full and ordinary meaning.

### J. Term 30: "Immutable Draft Data Element" Is Not Indefinite

Coinbase improperly manufactures an alleged "impossibility" by reading the word "draft" out of context. Op. Br. at 27-30. Its argument ignores both the surrounding language of claims 1 and 7 of the '668 patent, and the specification's description of the claimed conversion process. But indefiniteness turns on whether the claims, read in light of the specification, inform a person of ordinary skill about the scope of the invention with reasonable certainty. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Claims 1 and 7 readily satisfy that standard.

In both claims 1 and 7, a "draft informational object" is created, authenticated, converted to immutable form, and written into memory. Similarly, a "draft data element" is created, incorporated into the draft informational object, and then authenticated and converted to immutable form as part of the same claimed process. The table below juxtaposes the claims and annotates those steps for both the "informational object" and the "data element."

| | |
|---|---|
| 1.A common point authoring system for complex sharing of hierarchically authored data objects in a distribution chain, comprising: | 7.A method of operating a common point authoring system for complex sharing of hierarchically authored data objects in a distribution chain, comprising: |
| authoring means for enabling an authorized authoring member to **create** data comprising a draft informational object, which uniquely identifies a product for tracking purposes; | enabling an authorized authoring member to **create** data comprising a draft informational object, which uniquely identifies a product for tracking purposes; |
| **authenticating** means for enabling an authorized individual to authenticate said draft informational object created by said authorized authoring member; | enabling an authorized individual to **authenticate** said draft informational object created by said authorized authoring member; |
| completion means for **converting** said authenticated informational object created by said authorized authoring member to a | **converting** said authenticated informational object created by said authorized authoring member to a corresponding immutable |

| | |
|---|---|
| corresponding immutable informational object which is identified by a unique identifier;<br><br>database management means for **writing** said created immutable informational object into a memory for use by authorized accessing members;<br><br>draft data element means for enabling an authorized authoring member to **create** data comprising at least one draft data element;<br><br>wherein said authoring means **incorporates** said at least one draft data element into said draft informational object;<br><br>wherein said authenticating means comprises:<br><br>data element **authenticating** means for enabling an authorized individual to authenticate said draft data element created by said authorized authoring member; and<br><br>wherein said completion means **converts** said authenticated at least one draft data element to a corresponding immutable draft data element which is identified by a unique identifier. | informational object which is identified by a unique identifier;<br><br>**writing** said created immutable informational object into a memory for use by authorized accessing members;<br><br>enabling an authorized authoring member to **create** data comprising at least one draft data element;<br><br>wherein said step of enabling an authorized authoring member **incorporates** said at least one draft data element into said draft informational object;<br><br>wherein said step of enabling an authorized individual to authenticate comprises:<br><br>enabling an authorized individual to **authenticate** said draft data element created by said authorized authoring member; and<br><br>wherein said step of converting **converts** said authenticated at least one draft data element to a corresponding immutable draft data element which is identified by a unique identifier. |

Read as a whole, the claims make clear that the "immutable draft data element," like the "immutable informational object," is the resulting immutable version of the corresponding draft item. The draft data element is created, incorporated into the draft informational object, authenticated, and then converted to an immutable state. The claims thus describe a change in state, not a requirement that the data element be both changeable and immutable simultaneously.

Accordingly, a person of ordinary skill would understand with reasonable certainty what the limitation requires. *See Nautilus*, 572 U.S. at 910.

The specification confirms this understanding. Figure 4 describes a "draft Data Element" that is reviewed for format and content and, if approved, results in the creation of a "immutable Data Element." *See* '668 patent, 16:39-17:62. Coinbase itself describes these disclosures as "taking a preliminary 'draft Data Element' as an input and returning an unchangeable 'immutable Data Element' as the output." Op. Br. at 28. That is precisely the change in state recited by the claim, not a requirement that the data element be both changeable and unchangeable simultaneously.

The Order further supports Pardalis' position. In construing this term as part of additional means-plus-function language in claim 1 of the '668 patent, Judge Payne did not find the phrase "immutable draft data element" to be confusing, much less indefinite, and concluded that "[t]he specifications thus disclose that converting to 'immutable' form is performed by 'authoring server 143.'" Order at 66.

Notably, Coinbase does not even claim that a person of ordinary skill would not understand the claims to a reasonable certainty, much less provide any evidence of that. Instead, Coinbase relies only on attorney-argument that the term is allegedly self-contradictory and thus must be indefinite. But the cases that Coinbase relies upon are distinguishable. In *WSOU Invs. LLC v. Google LLC*, the court found that the claim limitation "second part in between the first part and the second part" was nonsensical because the "second part" could not be "in between the first part" and itself. 2023 U.S. App. LEXIS 25255 at *20 (Fed. Cir. Sept. 25, 2023). The court noted that no party contended the term had its plain meaning, that the specification did not provide any clarity, and that the plaintiff's proposed construction ("second part in between [the boundary of] the first part and [the outer boundary of] the second part") was an impermissible rewrite that was not

supported by the specification. *Id.* at *21. Here, the claims and specification provide the clarity that was missing in *WSOU*: the draft data element is converted to immutable form. Pardalis therefore need not rewrite the claim to resolve any alleged impossibility.

Coinbase also relies on *In re Shafovaloff*, 2025 WL 1779173, at *2-3 (Fed. Cir. 2025), in which the court found that the claim requirement of "a bent tab incorporated within the one piece planar mirror surface" was indefinite because "[a] bent tab inherently cannot be incorporated within the planar mirror because the nature of the tab being bent means it is not within one plane, and therefore cannot be 'within' the planar mirror surface as the claims require." There, the claim required incompatible conditions at the same time. Here, it does not. The claimed conversion causes the draft data element to become immutable, just as the claim separately provides for conversion of the draft informational object to immutable form.

Nor does *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366–67 (Fed. Cir. 2021), support Coinbase. There, the plaintiff agreed that those requirements were impossible and asked the court to substantially rewrite the claims. *See id*. Here, Pardalis does not concede that the limitation is impossible or ask the Court to rewrite the claim. Read as a whole and in light of the specification, the claims provide reasonable certainty as to what the limitation requires: conversion of a draft data element to an immutable data element.

## III. CONCLUSION

For the foregoing reasons, Pardalis respectfully requests that this Court enter a Claim Construction Order adopting Pardalis' constructions as proposed herein.

Dated: September 15, 2026

Respectfully submitted,

*/s/ Justin B. Kimble*
Justin B. Kimble (Lead Counsel)
Texas Bar No. 24036909
Patrick J. Conroy
Texas Bar No. 24012448
Nathan L. Levenson
Texas Bar No. 24097992
**Nelson Bumgardner Conroy PC**
2727 N. Harwood, Suite 250
Dallas, Texas 75201
Tel: (214) 446-4950
justin@nelbum.com
pat@nelbum.com
nathan@nelbum.com

Janson H. Westmoreland
Texas Bar No. 24131755
**Nelson Bumgardner Conroy PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Tel: (817) 377-9111
janson@nelbum.com

Taryn N. Trusty
Illinois Bar No. 6344409
**Nelson Bumgardner Conroy PC**
745 McClintock Drive, Suite 340
Burr Ridge, IL
Tel: (708) 675-1974
taryn@nelbum.com

Mark D. Siegmund
Texas Bar No. 24117055
**Cherry Johnson Siegmund James, PC**
7901 Fish Pond Road
2nd Floor
Waco, Texas 76720
Tel: (254) 732-2242
msiegmund@cjsjlaw.com

**Attorneys for Plaintiff**
**Pardalis Technology Licensing, L.L.C.**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served via electronic mail upon all counsel of record on September 15, 2026.

*/s/ Justin B. Kimble*
Justin B. Kimble